UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| MARY ARGELLA FITZPATRICK,<br><br>  Plaintiff,<br><br>  v.<br><br>LENS.COM INC.,<br><br>  Defendant. | No. 24 CV 2700<br><br>Judge Manish S. Shah |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Mary Fitzpatrick bought contact lenses from defendant Lens.com's website. Fitzpatrick alleges that Lens.com advertised certain prices online, but the actual prices at checkout were higher because of hidden fees and charges. She brings a putative class action alleging defendant violated the Illinois Consumer Fraud Act. Defendant Lens.com moves to transfer venue to the District of Nevada under 28 U.S.C. § 1404(a) and, alternatively, moves to dismiss for failure to state a claim under Fed. R. Civ. P. 12(b)(6). For the reasons discussed below, the motion to transfer is granted.

**I. Legal Standard**

For convenience and in the interest of justice, a district court may transfer any civil action to any other district where it might have been brought or to any district to which all parties have consented. 28 U.S.C. § 1404(a). A forum-selection clause "may be enforced through a motion to transfer under § 1404(a)." *Atl. Marine Const. Co. v. U.S. Dist. Ct. for W. Dist. of Texas*, 571 U.S. 49, 59 (2013). When the parties

agree to be bound by a forum-selection clause, a district court should transfer the case to the forum specified unless extraordinary circumstances apply. *Id.* at 62. With a forum-selection clause, the plaintiff's choice of forum holds no weight, the parties' private interests are immaterial, and the proposed court's familiarity with the law that must govern the action is no longer relevant since those rules would not follow the transferred case. *Id.* at 64–65. The party opposing transfer "bears the burden of establishing that the transfer to the forum for which the parties bargained is unwarranted." *Id.* at 63.

## II. Facts

Defendant Lens.com, Inc. sells corrective contact lenses online. [1-1] ¶ 11.[1] Plaintiff Mary Fitzpatrick bought contacts through Lens.com's website. *Id.* ¶¶ 29–30. Customers like Fitzpatrick can select contact lenses to buy, provide their prescription information, and navigate to the "shopping cart" page. *Id.* ¶¶ 18–19. To move from the shopping cart to checkout, the user must click "Go To Checkout." *Id.* ¶ 21. Clicking prompts the user to either sign in to their account or provide their shipping

---

[1] Bracketed numbers refer to entries on the district court docket. Referenced page numbers are taken from the CM/ECF header placed at the top of filings. The facts are taken from plaintiff's complaint, [1-1], and three exhibits attached by defendant to its motion to transfer, [5-2]. The exhibits include an affidavit describing Lens.com's navigation process during checkout, images of the webpages, and the Terms & Conditions of Use hyperlinked on those pages. [5-2] at 2–17. Because the webpages are referred to in the complaint and central to its claims, I take judicial notice of these exhibits. *See Geinosky v. City of Chicago*, 675 F.3d 743, 745 n.1 (7th Cir. 2012). Plaintiff disputes the accuracy of the images only to the extent that they are reproduced in a size that is too large. [9] at 4 n.3. The larger images of the "Continue" and "Go To Checkout" buttons are reproduced here with the understanding that the screenshots of the websites may not be the size that plaintiff and other users encountered.

information. *Id*. For a user shopping on a computer, the page requesting shipping information looks like this:



[1-1] ¶ 21; [5-2] at 17. The "Continue" button is a red rectangle with white text. *Id*. Underneath the button is the text, in smaller black font, "By continuing you agree to our Terms of Use & Privacy Policy."



[5-2] at 17. The underlined portion of the text is hyperlinked. *Id*. at 3. If the user hovers their mouse over the hyperlinked text, the text changes in color from black to red. *Id*. If they click on the hyperlinked text, they are directed to a separate page with

3

Lens.com's Terms of Use. *Id.* at 3–4. The Terms of Use contains a forum-selection clause:

> These Terms and Conditions of Use shall be governed by and construed in accordance with the laws of the State of Nevada, without regard to choice of law rules. Any litigation arising out of or in connection with the use of this site shall be exclusively venued in state or federal courts located in Clark County, Nevada, with you and Lens.com waiving the right to trial by jury, agreeing that each party to litigation shall bear its own attorney's fees and costs, and waiving any objections to personal jurisdiction and the appropriateness of this venue, including those arising under the doctrine of forum non conveniens.

*Id.* at 3.

The user can scroll past the "Continue" button without clicking it. [1-1] ¶ 22. If the user scrolls down, there's an order summary section at the bottom of the same page. *Id.* The order summary page looks like this:



4

[5-2] at 17. Like the "Continue" button, the "Go to Checkout" button is a red rectangle with white text. *Id.* Underneath the button is the same text with the hyperlinked feature.

> Go To Checkout
>
> By continuing you agree to our Terms of Use & Privacy Policy

*Id.* The user must click either the "Continue" button (below the shipping information section) or "Go To Checkout" button (below the order summary) to move on to the next page. [1-1] ¶ 22; [5-2] at 3. After the user clicks either button, they are directed to fill in their payment information and submit their order as the final step of checkout.[2] [1-1] ¶ 25.

    Fitzpatrick filed suit in the Circuit Court of Kane County, Illinois, alleging Lens.com violated the Illinois Consumer Fraud Act. [1-1]. Defendant Lens.com timely removed the case to this court under the Class Action Fairness Act.[3] [1].

---

[2] Plaintiff alleges other facts about the advertising and pricing of defendant's products, but I limit the discussion of facts to those relevant in resolving defendant's motion to transfer.

[3] This court has subject matter jurisdiction over the state-law claims under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2), which creates federal jurisdiction if "(1) a class has 100 or more class members; (2) at least one class member is diverse from at least one defendant; and (3) there is more than $5 million, exclusive of interest and costs, in controversy in the aggregate." *Roppo v. Travelers Com. Ins. Co.*, 869 F.3d 568, 578 (7th Cir. 2017). CAFA jurisdiction is satisfied because the proposed class would exceed 100 members; minimal diversity is met because at least one member of the class is a citizen of a different state than a defendant; and the amount in controversy alleged exceeds $5,000,000. [1] ¶¶ 5–6, 16–28; *Blomberg v. Serv. Corp. Int'l,* 639 F.3d 761, 763 (7th Cir. 2011) (a defendant's "good-faith estimate" of the amount in controversy need only be plausible and supported by evidence).

**III.   Analysis**

    **A.   Contract Formation**

There's no dispute that Lens.com's Terms of Use designates venue in Nevada. Fitzpatrick doesn't argue that her claim falls outside the scope of the forum-selection clause. The only dispute is whether Fitzpatrick entered into a valid contract with Lens.com. The parties disagree about whether Illinois or Nevada law applies, but the same general principles of contract formation apply under either state's law. *See Sgouros v. TransUnion Corp.*, 817 F.3d 1029, 1034 (7th Cir. 2016) ("Formation of a contract requires mutual assent in virtually all jurisdictions; Illinois courts use an objective approach to that question."); *Grisham v. Grisham*, 128 Nev. 679, 685 (2012) (under Nevada law, a contract "requires mutual assent or a meeting of the minds on the contract's essential terms") (cleaned up).[4] The contract contained a Nevada choice of law provision, so I apply Nevada law. *See Jackson v. Payday Fin., LLC*, 764 F.3d 765, 775 (7th Cir. 2014) (holding that the law designated in a contract's choice of law clause should be used to determine the validity of the forum selection clause). Under Nevada law, a party must have actual or constructive notice of a contract's terms to manifest assent. *Cf. Adelson v. Harris*, 133 Nev. 512, 518 (2017); *see also In re Zappos.com, Inc., Customer Data Sec. Breach Litig.*, 893 F.Supp.2d 1058, 1065 (D. Nev. 2012) (applying Nevada law and finding no manifestation of assent where an inconspicuous hyperlink did not provide constructive notice).

---

[4] The parties agree that there is no substantive difference between the states' laws. *See* [9] at 5 n.4; [5-1] at 9; [13] at 3.

There are two types of online contracts: clickwrap and browsewrap. *Domer v. Menard, Inc.*, 116 F.4th 686, 694–95 (7th Cir. 2024). Clickwrap agreements require a customer to affirmatively indicate assent by clicking or checking a box. *Id.* at 694. Browsewrap agreements, on the other hand, "provide veiled notice to customers that mere use of the website constitutes agreement to various terms and conditions." *Id.* at 694–95 (citing *Oberstein v. Live Nation Ent., Inc.*, 60 F.4th 505, 513 (9th Cir. 2023)). Browsewrap agreements are rarely enforced. *Id.* at 695. A wide range of online contracts are hybrid agreements that fall "somewhere in between." *Id.* A "notice of deemed acquiescence and a link" to terms of an agreement on a webpage is a type of hybrid-wrap agreement. *Id.* When agreement is largely passive, as is the case here, a contract is enforceable only if "(1) the website provides reasonably conspicuous notice of the terms to which the consumer will be bound; and (2) the consumer takes some action, such as clicking a button or checking a box, that unambiguously manifests his or her assent to those terms." *Id.* (citation omitted).

    *1. Reasonably conspicuous notice*

Notice is evaluated from the perspective of a reasonable online shopper. *Domer*, 116 F.4th at 695. A reasonable online shopper is assumed to have basic familiarity with websites, hyperlinks, and online agreements. *Id.* Whether a website provided reasonable notice to the user is taken "in light of the whole webpage." *Id.* Five factors are relevant, though none are dispositive: "(1) the simplicity of the screen; (2) the clarity of the disclosure; (3) the size and coloring of the disclosure's font; (4) the spatial

7

placement of the hyperlink; and (5) the temporal relationship to the user's action." *Id.*

The first factor looks at the presence of clutter on a screen that may divert the user's attention from the disclosure. *See Domer*, 116 F.4th at 696. A webpage may be cluttered if it contains multiple fields or buttons, unnecessary information like promotions and advertisements, different fonts and colored text, or too many hyperlinks. *See id.* (finding webpage to be uncluttered because it had ample white space, information organized neatly into a few boxes and columns, less than a handful of hyperlinks, and font in a consistent color and typeface); *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 237 (2d Cir. 2016) (finding notice was not reasonably conspicuous where order page contained between fifteen and twenty-five links, text in multiple font sizes and colors, and multiple buttons and promotional advertisements).

Lens.com's webpage contains sections for the user's shipping information and an order summary. The shipping information section includes fields for the user's address, an optional box that turns on order notifications via text, a click-down box where the user can select the shipping method, and the "Continue" button with the disclosure, "By continuing you agree to our Terms of Use & Privacy Policy" below it. There are two other hyperlinks the user can click on: a hyperlink to sign into the user's account and a hyperlink for help with filling in a shipping address. This presentation is relatively uncluttered: there are no distracting advertisements and promotions, there are only four hyperlinks, and three buttons. The font varies in size, but it's in a consistent typeface and there are only three colors (black, red, and white).

8

The background is white and provides contrast for the black-colored text. There's also ample white space. The order summary section is more crowded. It includes an image of the product(s) in the cart, drop down boxes to select quantity, hyperlinks to update doctor and prescription information, an optional box to turn on automatic refills of the product, and a hyperlink to enter a promotional code. The bottom right of the page is a column that shows the total price after taxes, fees, and rebate is applied. There's also a drop-down box to select the shipping method. The order summary contains a few elements that are non-standard or extraneous: boxes showing a free lens case with purchase, how much the user saved on the order after rebate, and how much the user saved on their order by shopping with Lens.com. Even with the presence of these additional elements, the order summary page isn't so crowded as to make the disclosure underneath the "Go To Checkout" button inconspicuous. Taken as a whole, the webpage's design is relatively stream-lined and uncrowded with distracting elements. The two disclosures below the "Continue" and "Go To Checkout" buttons were reasonably conspicuous within this context.

If terms or conditions are hyperlinked rather than displayed directly to the user, there must be a "clear prompt directing the user to read them." *Domer*, 116 F.4th at 696. The hyperlink must be set apart from other text in some way. *Id.* Design elements like bold-face, capitalization, or contrasting color can alert the user to the hyperlink. *Id.* at 696–97. Courts have found that simply underlining hyperlinked text is often insufficient to provide notice of a link unless some other design element draws the user's attention to it. *See Berman v. Freedom Fin. Network*, LLC, 30 F.4th 849,

9

857 (9th Cir. 2022) ("Consumers cannot be required to hover their mouse over otherwise plain-looking text or aimlessly click on words on a page in an effort to 'ferret out hyperlinks.'"); *but see Patrick v. Running Warehouse, LLC*, 93 F.4th 468, 477 (9th Cir. 2024) ("That the links are not blue, underlined, or capitalized does not undercut the district court's conclusion that [defendant] provided [plaintiff] with reasonably conspicuous notice.") (internal quotation marks omitted). Lens.com's hyperlinked text is not set apart in a different color, bold-faced, or capitalized. It is underlined, which alone may be insufficient to draw attention to the text, but the text also changes color from black to red when a cursor hovers over it. The addition of this design element—along with the placement of the hyperlinked text directly below the buttons and away from other text—sufficiently sets the text apart and alerts the user to the Terms of Use.

    The font size of the disclosure is smaller than the "Continue" button, but it is not "a font so small that it is barely legible to the naked eye." *Berman*, 30 F.4th at 856–57. The language of the disclosure itself also makes clear that clicking the button means agreement to Lens.com's contractual terms. *See Domer*, 116 F.4th at 697 (disclosure stating "**Please note**:... By submitting your order you accept our Terms of Order" was a clear prompt that provided reasonable notice) (emphasis in original); *Keebaugh v. Warner Bros. Ent. Inc*, 100 F.4th 1005, 1020 (9th Cir. 2024) (notice stating "By tapping 'Play' I agree to the Terms of Service" clearly denoted that continued use constituted acceptance of the terms).

A hyperlinked disclosure should be spatially and temporally connected to the required act that manifests assent. *Domer*, 116 F.4th at 698–99. Lens.com's disclosures and hyperlinks to the Terms of Use are directly below the "Continue" and "Go To Checkout" buttons. *See Starke v. SquareTrade, Inc.*, 913 F.3d 279, 292 (2d Cir. 2019) ("The text, including the hyperlinks to the Terms and Conditions and Privacy Policy, appeared directly below, i.e., was 'spatially coupled' with the registration button."); *Oberstein*, 60 F.4th at 517 ("The notices were not buried on the bottom of the webpage or placed outside the action box, but rather were located directly on top of or below each action button."). The disclosure is also temporally connected to the required activity, which means the link to the Terms of Use is on the same page as the "Continue" and "Go To Checkout" buttons. *See Domer*, 116 F.4th at 699; *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 78 (2d Cir. 2017) (finding the "register" button was "temporally coupled" with terms and conditions because terms were "provided simultaneously to enrollment").

Fitzpatrick argues notice is not conspicuous because the order summary is only visible if the user scrolls below the field for shipping information. She also takes issue with the website design where the Terms of Use are presented "in the middle of the process where no reasonable consumer would believe by hitting the big red 'Continue' button after filling in shipping information, he or she was assenting to the Terms." [9] at 8. A layout that requires the user to scroll a page for information weighs against conspicuous notice. *See Meyer*, 868 F.3d at 78 (taking into account that the "entire screen is visible at once, and the user does not need to scroll beyond what is

11

immediately visible to find notice of the Terms of Service"). But here, the user can click either button to proceed to the next stage of checkout. The user does not need to scroll down to the order summary to see the hyperlinked Terms of Use. The disclosures and hyperlinks are available in two places on the page rather than only at the bottom of the page. *See Domer*, 116 F.4th at 698 (noting that the words "Terms of Order" appearing twice on a page increased the likelihood that the user saw them).

Lens.com's webpage disclosing the Terms of Use is not "a visually bewildering screen." *Domer*, 116 F.4th at 699. Taken as a whole, the page provided reasonably conspicuous notice of the Terms of Use to Fitzpatrick.

### 2. *Manifestation of assent*

Because Lens.com provided reasonably conspicuous notice of the Terms of Use, Fitzpatrick unambiguously manifested assent to those terms when she clicked the "Continue" or "Go To Checkout" button. *See Domer*, 116 F.4th at 699 ("[T]he Menards notice was reasonably conspicuous, so [plaintiff] manifested her assent to accept the Terms of Order by going through with the purchase."). In contrast to clickwrap agreements where the user affirmatively indicates assent, hybrid agreements do not ask whether the user agrees to the terms or not. But this does not bar a finding that the user manifested assent. Fitzpatrick's assent was not affirmatively indicated, but

it was unambiguous in light of the reasonably conspicuous notice. *Id.* at 700. The forum-selection clause is valid, and Fitzpatrick is bound by it.

### B. Public-Interest Factors

The forum-selection clause that Fitzpatrick agreed to is controlling unless the case is "exceptional." *Atl. Marine*, 571 U.S. at 49. Private-interest factors are inapplicable to this analysis. *Id.* at 63–64. Public-interest factors include:

> administrative difficulties stemming from court congestion; the local interest in having localized disputes decided at home; the interest in having the trial of a diversity case in a forum at home with the law that must govern the action; the avoidance of unnecessary problems in conflicts of laws or in the application of foreign law; and the unfairness of burdening citizens in an unrelated forum with jury duty.

*IAC/InterActiveCorp v. Roston*, 44 F.4th 635, 645 (7th Cir. 2022). But these factors "rarely outweigh the parties' private interests in enforcing a forum-selection provision." *In re Ryze Claims Sols., LLC*, 968 F.3d 701, 708 (7th Cir. 2020) (internal quotation marks omitted).

The public-interest factors in this case do not "overwhelmingly disfavor a transfer." *Atl. Marine*, 571 U.S. at 67. As the party opposing a valid forum-selection clause, the burden is on Fitzpatrick to make this showing. Fitzpatrick points out that her claim is brought entirely under Illinois law, which Illinois courts are more familiar with than other courts. [9] at 14. Because federal judges routinely apply other state's laws, a court's familiarity with state law does not weigh in favor of denying transfer unless features of the state law are "exceptionally arcane." *Atl. Marine*, 571 U.S. at 67–68. The Illinois Consumer Fraud Act is not exceptionally arcane—the core prohibitions of state consumer protection statutes like the Act are

13

"interpreted for the most part interchangeably." *See Beardsall v. CVS Pharmacy, Inc.*, 953 F.3d 969, 972 (7th Cir. 2020). Fitzpatrick points out that the median time from filing to disposition in this district is 5.7 months speedier than in the District of Nevada. A median difference of six months in reaching trial and resolution does not justify denial of transfer. *See In re Ryze Claims Sols.*, 968 F.3d at 710 ("The *forum non conveniens* doctrine should not be used as a solution to court congestion; other remedies, such as placing reasonable limitations on the amount of time each side may have to present evidence, are more appropriate.").

Fitzpatrick also contests Lens.com's argument that judicial resources would be conserved if this case is transferred to Nevada and consolidated with a similar class action pending in *Nail v. Lens.com, et al.*, 2024 WL 4477012 (D. Nev. Oct. 11, 2024). [9] at 15; *see also* [18] and [19] (parties' supplemental briefing). Because this is not a typical § 1404(a) analysis, the burden is not on Lens.com to show judicial resources would be conserved by transfer, and Fitzpatrick's attack on that front doesn't move the public-interest needle.

This case isn't an exceptional one that warrants departing from the parties' selected forum of Nevada. A forum-selection clause is controlling unless (1) the clause is invalid because of "fraud or overreaching," (2) "enforcement would contravene a strong public policy of the forum in which suit is brought," or (3) "the litigant will for all practical purposes be deprived of his day in court." *Gemini Techs., Inc. v. Smith & Wesson Corp.*, 931 F.3d 911, 915 (9th Cir. 2019) (cleaned up); *see also In re Ryze Claims Sols.*, 968 F.3d at 711. Fitzpatrick does not contend that the forum-selection

14

clause was the product of fraud or overreaching. She would not be deprived of her day in court if the clause is enforced and the case is transferred to Nevada. And there's no strong public policy of Illinois identified by the parties that would be contravened by enforcing the clause.

Because no exceptional circumstances apply, the forum-selection clause is controlling, and transfer is appropriate.

### IV. Conclusion

Defendant's motion to transfer venue, [5], is granted. The Clerk shall transfer this case to the United States District Court for the District of Nevada.

ENTER:

_____
Manish S. Shah
United States District Judge

Date: October 23, 2024

15